No. 92,809
92,810

HEATHER S. REESE, formerly Heather S. Waldschmidt, *Plaintiff/ Appellee*, v. WILLIAM E. MURET, Administrator of the Estate of Wade Samuel Waldschmidt, Jr., deceased; and DELORIS M. CLEARY, *Defendants*, and SANDRA I. WALDSCHMDIT, *Intervenor/Appellant*.

(150 P.3d 309)

Opinion filed February 2, 2007.

*Rachael K. Pirner*, of Triplett, Woolf & Garretson, L.L.C., of Wichita, argued the cause, and *Tyler E. Heffron*, of the same firm, and *Scott T. Curry-Sumner*, of Law Offices of Scott T. Curry-Sumner of Utrecht, The Netherlands, were with her on the briefs for the intervenor/appellant.

*Orvel B. Mason*, of Mason & Velasquez, P.A., of Arkansas City, argued the cause and was on the brief for the plaintiff/appellee.

The opinion of the court was delivered by

ROSEN, J: This is a paternity action in the context of a probate case. Heather S. Reese (formerly Waldschmidt) (Heather) seeks a determination that she is the child of Wade Samuel Waldschmidt, Jr. (Sam). Sam's spouse, Sandra Waldschmidt (Sandra), opposed

Heather's claim as a child in Samuel's intestate estate and filed a motion for genetic testing. Heather filed a paternity action pursuant to the Kansas Parentage Act, claiming that Sam was her presumptive father. Sandra intervened in the paternity action and moved for genetic testing. The district court denied Sandra's motions in both the probate and paternity actions, and she brings this appeal, claiming that *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989), does not apply to genetic testing in paternity cases brought by adults for the purpose of determining inheritance.

Sam married Deloris Hibbs (Deloris) on June 1, 1970. On January 25, 1971, Deloris gave birth to a daughter named Heather Shea Waldschmidt (Heather). Heather's birth certificate named Sam as her father. Deloris and Sam divorced on July 12, 1972. The divorce pleadings acknowledged Heather as a child of the union. The district court ordered Sam to pay child support and granted Sam visitation with Heather.

In November 1972, Sam filed a motion to terminate his child support payments, alleging that Deloris "took the minor child of said parties and disappeared." Sam's motion further alleged that Deloris was unfit and that he should have custody of Heather. In December 1972, the district court entered an order terminating Sam's child support until Deloris could show just cause to have the child support reinstated. Deloris never reinstated Sam's child support obligation, but Sam's Aunt Irene provided financial assistance to Deloris and Heather.

After the divorce, Sam had little contact with Heather. Sam saw Heather at Waldschmidt family gatherings for Thanksgiving and Christmas but did not attempt to have a relationship with her. However, Heather was very close to members of Sam's family including his mother, Margaret; his brother, David; and his Aunt Irene. Heather was also close to her Waldschmidt cousins. Although Heather did not have a relationship with Sam, she always considered him to be her father.

Sam married Sandra Woodard in October 1976. According to Sandra, Sam said that Heather was not his child. Sam and Sandra had no children. They separated in September 1988 and divorced in 1990. Sandra moved back in with Sam in 1994, moved out again

in 1995, and remarried him in 1996. After their remarriage, Sandra did not live with Sam, but visited him occasionally on weekends.

Before Sandra moved back in with Sam in 1994, Sam executed a will leaving everything to his sisters, Camille and Anna Jane. On December 10, 2002, Sam visited with an attorney about his estate. Sam told the attorney that he had a daughter. The attorney perceived that there was tension between Sam and Sandra regarding Sam's daughter, but Sam did not explain the situation. On or about December 13, 2002, Sam committed suicide.

On December 18, 2002, Heather petitioned the district court to appoint administrators for Sam's estate. Sandra responded to Heather's petition, denying that Heather was Sam's daughter and requesting the court to appoint her as the administrator for Sam's estate. Sandra also filed a petition in the probate action for genetic testing to determine whether Sam was Heather's biological father. The district court appointed an attorney, who was a disinterested third party, as the administrator of Sam's estate.

In response to Sandra's motion for genetic testing, Heather filed a paternity action pursuant to the Kansas Parentage Act, seeking a determination that Sam was Heather's father. The petition alleged that Sam was Heather's presumed father because she was born during her mother's marriage to Sam, Sam had acknowledged his paternity in the divorce pleadings, and Sam was ordered to pay child support on Heather's behalf. Sandra filed a motion to intervene and a motion for genetic testing. Over Heather's objection, the district court granted Sandra's motion to intervene pursuant to K.S.A. 60-224(b).

Heather objected to Sandra's motions for genetic testing. The district court then ordered a *Ross* hearing to determine whether it was in Heather's best interests to grant Sandra's motions. The parties agreed to submit the evidence for the *Ross* hearing based on stipulated depositions and exhibits rather than conducting an evidentiary hearing. Based on this evidence, the district court held that it was not in Heather's best interests to conduct genetic testing and denied Sandra's motion.

Sandra filed a motion for an interlocutory appeal in the paternity action and requested a ruling on her petition for genetic testing in

the probate action. The district court denied Sandra's petition for genetic testing in the probate action and granted her request for an interlocutory appeal in the paternity action. Sandra filed a notice of appeal in both actions. The appeals were consolidated and transferred to this court on our motion pursuant to K.S.A. 20-3018(c).

The matter was originally set for oral argument on December 5, 2005. However, upon finding a copy of Sam's will in the record, we remanded the matter to the district court for a determination of the validity of Sam's will. Thereafter, Sam's sister, Camille Pond, petitioned the district court to admit a copy of Sam's will to probate. After an evidentiary hearing, the district court denied Camille's petition to probate Sam's will because she had failed to overcome the presumption that Sam had destroyed or revoked his original will. Following the district court's refusal to probate Sam's will, we reinstated Sandra's appeal.

## ANALYSIS

Sandra argues that the district court improperly applied the ruling of *Ross*, 245 Kan. 591, in determining whether to order genetic testing in a probate action and in a parentage action brought by an adult for the purposes of applying the probate code. According to Sandra, *Ross* is inapplicable to a probate case and inapplicable to adults. We analyze this issue as a question of law subject to de novo review because it involves stipulated facts and statutory interpretation. See *In re Harris Testamentary Trust*, 275 Kan. 946, 951, 69 P.3d 1109 (2003); *In re Estate of Antonopoulos*, 268 Kan. 178, 180, 993 P.2d 637 (1999).

The fundamental rule of statutory construction is that the intent of the legislature governs. Legislative intent is first determined by considering the language in the statute. When a statute is plain and unambiguous, the court must give effect to the intention of the legislature as expressed, rather than determine what the law should or should not be. *In re Conservatorship of Huerta*, 273 Kan. 97, 105, 41 P.3d 814 (2002).

*Probate action*

Because this action arises out of the administration of a decedent's estate, we will begin our analysis with the probate code,

K.S.A. 59-101 *et seq.* K.S.A. 59-501 defines children for purposes of intestate succession, stating:

" 'Children' means biological children, including a posthumous child; children adopted as provided by law; and children whose parentage is or has been determined under the Kansas parentage act or prior law."

When Heather filed the petition to administer Sam's estate, she asserted her interest in Sam's estate as a biological child because none of the other possible definitions in K.S.A. 59-501 applied. As long as Heather's claim to Sam's estate was based on her being Sam's biological child, the genetic connection between Heather and Sam was in issue. Under this scenario, Sandra correctly argues that *Ross* is inapplicable to an intestate claim based on the biological definition of child because genetic testing is the only conclusive means of establishing biological parentage.

However, K.S.A. 59-501 does not limit the definition of children to biological offspring. Rather, the definition of children is much broader, requiring the probate court to treat any person as a child if such person's parentage is or has been determined under the Kansas Parentage Act. K.S.A. 59-501(a). Heather invoked the Kansas Parentage Act as the basis for her inheritance claim under K.S.A. 59-501 when she filed her petition to determine paternity under the Act. We note that K.S.A. 59-501(a) does not require a determination under the Kansas Parentage Act to occur prior to a probate proceeding. Rather, the legislature acknowledged that proceedings under the Kansas Parentage Act may occur simultaneously with probate proceedings by incorporating the phrase "whose parentage is or has been determined" in the definition of children. See K.S.A. 59-501(a).

The probate code treats a determination of parentage pursuant to the Kansas Parentage Act as conclusive. See K.S.A. 59-501(a). Once paternity is established in accordance with the Kansas Parentage Act, the probate code provides no mechanism for challenging that paternity determination. Because Heather eliminated the issue of biological parentage in the probate action by filing her paternity action and the probate code does not authorize genetic testing to challenge a paternity determination under the Kansas

Parentage Act, there is no statutory basis for Sandra's motion for genetic testing in the probate case. Although Sandra correctly argues that *Ross* does not apply to an order for genetic testing under the probate code, the district court properly denied Sandra's motion because there was no statutory basis for the motion.

*Paternity action*

Pursuant to the Kansas Parentage Act, a man is presumed to be the father of a child born while the man is married to the child's mother. K.S.A. 38-1114(a)(1). A child or a person on behalf of the child may file an action at any time to establish paternity when there is a presumption of paternity. K.S.A. 38-1115(a)(1). However, a presumption based on genetic test results must relate to genetic testing that occurs prior to the filing of the paternity action. See K.S.A. 38-1114(a)(5); *In re Estate of Foley*, 22 Kan. App. 2d 959, 925 P.2d 449 (1996). The child, the child's mother, and the presumptive father are parties to the paternity action. K.S.A. 38-1117(a). K.S.A. 38-1118(a) requires the district court to order genetic testing when any party requests genetic testing. However, the *Ross* court tempered the statutory requirement of K.S.A. 38-1118(a) by requiring the district court to conduct a hearing prior to issuing an order for genetic testing to determine whether genetic testing is in the best interests of the child. *Ross*, 245 Kan. at 602. Since *Ross* was decided in 1989, the legislature has not amended the statute to reverse the limitation imposed by *Ross*.

In *Ross*, the child, R.A.R., was born during the marriage of his mother, Sylvia, to Robert. When Sylvia and Robert divorced, Sylvia alleged that Robert was R.A.R.'s father. Robert was granted joint custody and ordered to pay child support. Two years later, Sylvia filed a petition pursuant to the Kansas Parentage Act to establish Charles as R.A.R.'s biological father. Sylvia wanted Charles to be named R.A.R.'s father so he could consent to R.A.R.'s adoption by Sylvia's current husband. To establish Charles as R.A.R.'s biological parent, Sylvia requested an order compelling all of the parties to submit to genetic testing. The district court ordered the genetic testing pursuant to K.S.A. 38-1118(a) and admitted the results over Robert's and Charles's objections. Based on the results of the ge-

netic testing, the district court determined that Charles was R.A.R.'s biological father and ordered him to pay child support. Nevertheless, the district court determined that it was in R.A.R.'s best interest to maintain his relationship with Robert, so the court continued the joint custody arrangement between Sylvia and Robert.

The *Ross* court reversed the district court's order for genetic testing and the order establishing Charles as R.A.R.'s biological father. 245 Kan. at 602. Noting that "the ancient presumption of the legitimacy of a child born in wedlock is one of the strongest presumptions known to the law," the *Ross* court held that the district court must conduct a hearing to determine whether it is in the child's best interests to perform genetic testing and determine the child's biological paternity as opposed to his presumptive paternity. 245 Kan. at 596, 602.

Sandra argues that *Ross* only applies to minor children. However, in *Ferguson v. Winston*, 27 Kan. App. 2d 34, 35, 36, 996 P.2d 841 (2000), the Court of Appeals applied *Ross* to a paternity proceeding involving an adult child. In *Ferguson*, the child, Michael, was born to Debra while she was living with Dale. Debra and Dale married after Michael's birth, and Debra recognized Dale as Michael's father for a period of 14 years. During Debra and Dale's divorce proceedings, Debra asserted for the first time that Dale was not Michael's biological father. In response, Dale filed a paternity action pursuant to the Kansas Parentage Act, seeking a determination that Michael was his son. Michael became an adult during the pendency of the paternity proceedings but was not made a party to the action and was not represented by a guardian ad litem. Without conducting a *Ross* hearing, the district court ordered genetic testing and summarily determined that Dale was not Michael's biological father.

The *Ferguson* court reversed the district court's decision, concluding that the district court committed both legal and procedural errors. 27 Kan. App. 2d at 36. The *Ferguson* court determined that Dale is Michael's presumptive father based on K.S.A. 38-1114. Because of the presumption that Michael is Dale's son, the *Ferguson* court held that the district court erroneously considered ge-

netic test results obtained without the benefit of a *Ross* hearing to determine whether it was in Michael's best interests to shift paternity from the presumptive father to the biological father. 27 Kan. App. 2d at 36-37. The *Ferguson* court also held that the district court erred when it treated the genetic test results as conclusive on the issue of paternity, stating:

"If DNA evidence is conclusive on the issue of paternity, we could simply do away with the judicial process in paternity cases. If the DNA test is conclusive, the paternity of children will be left for resolution by the scientists, and judges will become superfluous in that regard. We do not perceive the law to require or to recommend that result, and we hold that DNA evidence is not conclusive on the issue of paternity. On remand, if the trial court decides the DNA evidence is in Michael's best interests, it must still consider any other evidence offered before making a final decision." 27 Kan. App. 2d at 38.

The *Ferguson* court further concluded that the district court violated Michael's constitutional right to due process by proceeding without joining Michael as a party or protecting his interests by appointing a guardian ad litem on his behalf. 27 Kan. App. 2d at 38-39. Ordering that Michael be joined as a party and represented by counsel on remand, the *Ferguson* court suggested that the district court and the parties give "special attention" to Michael's wishes. 27 Kan. App. 2d at 40.

Sandra attempts to distinguish *Ferguson* by arguing that it did not involve a question of intestate succession. Sandra further argues that *Ferguson* does not apply because, unlike Michael, Heather was an adult when the action was filed. Sandra also points to Heather's representation by counsel and asserts that Heather waived her right to a *Ross* hearing when she filed the paternity action. Sandra focuses on the following excerpt from *Ferguson*:

"The facts which underlie this action give it a somewhat bizarre tilt and certainly create questions as to the relevance of the entire proceedings. To begin with, there is an obvious question as to just why this is being litigated. Michael became an adult during the litigation, and it is apparent there were and are no issues of child custody or child support being litigated." 27 Kan. App. 2d at 35.

Sandra's attempt to factually distinguish *Ferguson* overlooks the legal foundation of the *Ferguson* court's holding. Both the *Ross* and *Ferguson* courts were concerned with the purpose for deter-

mining a child's biological paternity when there was already a presumptive father. *Ross*, 245 Kan. at 601; *Ferguson*, 27 Kan. App. 2d at 35-36. Like the *Ross* court, the *Ferguson* court focused on the legal presumption of paternity that existed prior to the commencement of the paternity action. *Ross*, 245 Kan. at 596, 602; *Ferguson*, 27 Kan. App. 2d at 36. The *Ferguson* court expressed this focus by stating that the "relevance, in a legal sense, of who is Michael's biological father is questionable." 27 Kan. App. 2d at 35-36.

We believe the *Ross* and *Ferguson* analysis applies in this case. The relevance of who is Heather's biological father is questionable given the strong presumption that Sam was her father. The presumption of Sam's paternity existed for many years prior to the filing of this paternity action. Although the *Ferguson* court found the facts in that case were "somewhat bizarre" because it was litigated even though there were no issues regarding support or custody and the child had become an adult, this case demonstrates a set of circumstances in which an adult child may be forced to establish paternity pursuant to the Kansas Parentage Act even though a strong presumption of paternity already exists. *Ross* and *Ferguson* support the protection of presumptive paternity over biological paternity when it is in the child's best interests. We believe that protection extends to both minor and adult children.

Extending *Ross* to adult children accomplishes the legislature's intent as stated in the plain language of the statutory scheme. K.S.A. 38-1114 establishes six presumptions of paternity. If two presumptions conflict, the court must determine which presumption is founded on "weightier considerations of policy and logic, including the best interests of the child" before deciding which presumption controls. K.S.A. 38-1114(c). If any one of the presumptions arise, that presumption is a sufficient basis for an order requiring a man to support a child. K.S.A. 38-1114(e).

Without a *Ross* hearing to determine whether genetic testing is in the child's best interests, genetic testing becomes conclusive on the issue of paternity regardless of whether any other presumptions apply. As a result, denying adult children the protection of a *Ross* hearing is tantamount to rewriting the Kansas Parentage Act because it eliminates all of the other paternal presumptions besides

genetic testing. If the legislature intended for genetic testing to be conclusive for determining the paternity of an adult child, it could have included language limiting the remaining presumptions to minor children. However, the Kansas Parentage Act does not include such limiting language in the statutory scheme. See K.S.A. 38-1114. The *Ferguson* court recognized the legislature's intent to treat all children the same, regardless of age, when it specifically held that genetic testing is not conclusive on the issue of paternity and ordered the district court to consider all of the evidence available before deciding Michael's paternity if it determined that genetic testing was in Michael's best interests. *Ferguson*, 27 Kan. App. 2d at 38.

Extending *Ross* to adult children also furthers the purpose of the Kansas Parentage Act by protecting an adult child's right to inherit from his or her presumptive parent. The *Ross* court noted that the purpose of the Kansas Parentage Act is to provide for the "equal, beneficial treatment of children." 245 Kan. at 597. The Kansas Parentage Act requires courts to act in the child's best interests "when imposing legal obligations or conferring legal rights" on the parent/child relationship. 245 Kan. at 597. The *Ross* court construed the Kansas Parentage Act to recognize that "every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of his parentage." 245 Kan. at 597. While the court does not need to protect a child's right to support after emancipation, the need to protect a child's right to inherit, the child's family bonds, and the accurate identification of the child's parentage are not limited to the child's period of minority.

Finally, extending *Ross* to adult children recognizes the public policy that paternity is both broader and deeper than genetics. The recognition of family identity extends beyond the years of a child's minority. Every adult continues to be someone's son or daughter for purposes of family identification, family bonding, and inheritance. The parental relationship continues to exist regardless of whether the bonds are close, strained, or nonexistent. The presumptions of paternity set forth in K.S.A. 38-1114(a) were instituted to protect and maintain the concept of family identity. In-

truding upon this concept can cause emotional damage to children of all ages, not only to minors. See *Ross,* 245 Kan. at 602 (noting that "[t]he shifting of paternity from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of *any* child" [emphasis added]); *Ferguson,* 27 Kan. App. 2d at 39 (concluding that children have a fundamental liberty interest in maintaining familial relationships).

This case illustrates the importance of protecting the presumption of paternity. Although the ultimate issue in this case involves the division of a decedent's estate, the resolution of that issue turns on the legal designation of paternity for a child born with a presumptive father. Heather was born during Sam and Deloris' marriage. Sam's name appears on Heather's birth certificate. Heather was identified with Sam's familial name and included in the membership of Sam's family. Although her relationship with Sam was externally distant, she always believed he was her father. Sandra is attempting to vitiate a legal parent and child relationship that had not been questioned while Sam was alive. Requiring the district court to conduct genetic testing without determining whether it is in Heather's best interests would allow Sandra to accomplish after Sam's death that which could not be accomplished during Sam's lifetime. We cannot support a policy that gives anyone an opportunity to legally undermine a child's lifelong understanding of his or her parental heritage after his or her presumptive parents are deceased.

Sandra relies on *Tedford v. Gregory,* 125 N.M. 206, 959 P.2d 540 (Ct. App. 1998), for the proposition that courts should only consider the best interests of the child when the action involves a minor. In *Tedford,* an adult child filed a paternity action against her purported natural father even though the adult child had a presumptive father who had raised and supported her since her birth. The adult child filed the action seeking retroactive child support from the date of her birth. After ordering genetic testing, which revealed that the purported natural father was the adult child's biological father, the district court granted the adult child's paternity action and awarded her $50,000 in retroactive child support. Noting that case law in other jurisdictions was limited to ac-

tions involving minor children, the *Tedford* court upheld the district court's ruling, concluding that the best interest of the child standard did not apply to adult children in paternity actions. 125 N.M. at 211. The *Tedford* court reasoned that the putative father was not the proper party to assert the best interest of the child standard because the standard could not be invoked on behalf of someone other than the child. 125 N.M. at 212.

Applying the *Tedford* court's reasoning to this case does not support Sandra's argument for two reasons. First, *Tedford*, which is not controlling precedent, was decided before *Ferguson*, which is controlling precedent. Second, Heather invoked the application of the best interests standard. Under the *Tedford* court's reasoning, Heather is the proper party to invoke the standard. *Tedford* does not persuade us to allow anyone to bypass the best-interests standard simply because the child has reached the age of majority.

We cannot subvert the presumption of paternity in favor of biology without requiring a court to consider whether it is in the child's best interests regardless of the child's age. Interpretation of the relevant statutes, controlling precedent, and public policy support the district court's decision to hold a *Ross* hearing in Heather's paternity action. Sandra's appeal is limited to the legal application of *Ross* to an adult child's paternity action in the context of a probate case. Sandra does not contest the district court's determination that it is not in Heather's best interests to conduct genetic testing. Thus, we affirm the district court's thorough, well-reasoned memorandum decision denying Sandra's motions for genetic testing in both the probate and paternity cases and remand the matter for further proceedings.

ALLEGRUCCI, J., not participating.
LOCKETT, J., Retired, assigned.