No. 118,809

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Estate of
CHAD ALLAN FECHNER.

SYLLABUS BY THE COURT

1.

If whether a person is an heir is contested in a probate proceeding, the district court has the authority to order DNA testing to help determine the contested issue.

2.

When factual questions about paternity are contested in a probate proceeding, the Kansas Parentage Act presumptions for determining paternity set out in K.S.A. 2017 Supp. 23-2208 apply whether or not any of the parties to the probate proceeding would have standing to bring a separate Parentage Act case.

3.

In deciding whether to order DNA testing to determine paternity in a probate proceeding, the district court should consider (1) whether the DNA evidence would be relevant; (2) whether providing a sample will unduly infringe on privacy rights; (3) whether there is a reasonable possibility of match or non-match; (4) the presumptions of paternity set out in the Kansas Parentage Act; and (5) the best-interests-of-the-child test from *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989).

4.

A district court abuses its discretion by failing to exercise that discretion based on a misunderstanding of the law.

1

Appeal from Geary District Court; CHARLES A. ZIMMERMAN, magistrate judge. Opinion filed November 2, 2018. Vacated and remanded with directions.

*David P. Troup*, of Weary Davis, L.C., of Junction City, for appellant.

*Bruce D. Woolpert*, of Topeka, for appellee.

Before LEBEN, P.J., GREEN and MALONE, JJ.

LEBEN, J.: Rita Young and Gary Fechner both claimed an interest in an estate as relatives of a man who died with no will and no living parents, siblings, or children. But Rita suggested Gary wasn't biologically related to the man and asked for DNA testing.

The district court denied that request, concluding that it lacked authority to order such tests. After making that decision, the court heard evidence and sustained Gary's claim to a part of the estate.

But we agree with Rita that the district court had the discretionary authority to order DNA testing. And a court abuses its discretion when it fails to exercise that discretion based on a misunderstanding of the law. See *Green v. Unified Gov't of Wyandotte Co./KCK*, 54 Kan. App. 2d 118, 121, 397 P.3d 1211 (2017). So we will vacate the district court's judgment and send the case back for further consideration.

FACTUAL AND PROCEDURAL BACKGROUND

When Chad Fechner died in 2014, his maternal aunt, Rita Young, thought she was his only living relative, so she opened a probate estate. But Gary Fechner filed a claim in the estate alleging that he was Chad's half uncle, a claim supported by the birth certificates of Chad's father and Gary—both had the same father, making them half brothers. If true, Gary would share in Chad's estate with Rita.

2

Rita questioned whether those birth certificates and other records were accurate. The documents showed that Chad's father (and Gary's half brother) was Delwyne Fechner. Delwyne had died in 2002, but Rita had a letter a woman named Betty Lou had sent to Delwyne in 1999 saying that some "gossip going through Mrs. Hicklin[']s Beauty Shoppe here in Oakley" in the 1940s had been that Delwyne's real father was Earl Goble, not Willis Fechner. If so, Rita argued, Gary wasn't actually related to Delwyne or to Chad.

Rita asked that the court order Gary to submit to DNA testing to prove his biological relation to Chad. Some of Chad's DNA was available because the coroner had conducted an autopsy. Gary objected.

Gary argued that there was no authority to order DNA testing in a probate case. Rita argued that DNA testing would be the only way to tell whether Gary really was related to Chad. The court held that "[u]nder the circumstances of this case there is no authority for the Court to order the requested genetic testing."

The court then held an evidentiary hearing to determine whether Gary was one of Chad's heirs and eligible to receive some of the proceeds of Chad's estate. Gary presented his own birth certificate, which showed he was born October 27, 1946, to Dorothy Vera Fechner and Willis Wilbur Fechner. He also presented Delwyne's birth certificate, which showed he was born August 13, 1940, to Anna Laura Akers (we're told she went by Laura) and Willis Wilbur Bechner. The certificate showed that Laura and Willis were married at the time, and a 1940 Census document also showed them living together in Oxford, Kansas.

Rita presented the letter from Betty Lou. Rita noted that Delwyne's middle name, Earl, was the first name of Earl Goble, the man named in Betty Lou's letter. Rita pointed

3

out that Delwyne was born in McPherson, Kansas, and that the birth certificate said that his mother had lived in McPherson for 15 months—while there was no evidence showing Willis had lived in McPherson. And she presented evidence that Gary didn't attend Delwyne's funeral in 2002.

Based on the evidence presented, the court held that Gary, like Chad's father, was Willis' son and that both Rita and Gary were Chad's heirs. Rita appealed to our court.

ANALYSIS

The main question in this appeal is whether the district court was mistaken when it concluded it had no authority to order DNA testing in a probate case. That presents a legal question we review independently, with no required deference to the district court. See *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

The answer to this question will take us into three sets of Kansas statutes: (1) the Probate Code, which tells us who shares in a person's estate when that person dies; (2) the Kansas Code of Civil Procedure, which provides general procedures for resolving most legal disputes; and (3) the Kansas Parentage Act, which has default rules for figuring out whether a parent-child relationship exists—something that's not always decided by biology. Our starting point is the Probate Code since it most directly applies when a person dies and leaves property behind.

I. *The Standards of the Kansas Parentage Act Apply When Determining Who Is an Heir Under the Probate Code When a Person Dies Without a Will.*

The Probate Code determines who gets the property when a person dies without a will. When a person with no will dies with a spouse and no children, for example, the entire estate goes to the spouse. K.S.A. 59-504. In Chad's case, with no spouse, child, or

4

living parent, the property goes to "the heirs of [Chad's] parents." K.S.A. 59-508. Everyone agrees that a brother or sister of Chad's parents would be an heir, and there's no doubt that Rita was the sister of Chad's mother. If Gary is the brother of Chad's father, then he too is an heir and entitled to share in Chad's estate.

Gary is the brother of Chad's father if the two men had at least one parent in common. (That makes them half brothers, sufficient for inheritance purposes.) But Rita contests that connection, arguing that biological paternity trumps what was on the birth certificates. That's the real question lurking behind all others: does biology trump established presumptions of paternity in a probate case?

The contested factual question is whether Delwyne was Willis Fechner's child. If so, Delwyne was Gary's half brother and the uncle of Delwyne's son, Chad.

So what does the Probate Code tell us about this key question? It tells us who is legally the child of another person: "'Children' means biological children, including a posthumous child; children adopted as provided by law; and children whose parentage is or has been determined under the Kansas parentage act or prior law." K.S.A. 59-501(a). That definition applies when determining who takes property when a person dies without a will, K.S.A. 59-501(a), so it applies to our case.

From the definition, we know that a biological child would qualify. But there are three ways to qualify as a child: (1) biology, (2) adoption, and (3) having parentage determined under the Kansas Parentage Act (or prior law). K.S.A. 59-501(a) connects those three by "and," showing that all three ways qualify under the Probate Code. So biological children count. *And* adopted children. *And* children whose parentage is or has been determined under the Kansas Parentage Act.

5

So biology doesn't trump other considerations. Adopted children needn't be biologically related to the adopting parent. And there are several paternity presumptions under the Kansas Parentage Act—like having been born during a marriage—that make a person a presumptive father even if biology might say something different. Those children inherit too.

At the heart of our case is whether there's any conflict between the first of the three ways to qualify under the Probate Code ("biological children") and the third ("children whose parentage is or has been determined under the Kansas parentage act"). Within that third option, there are two situations we need to consider. In some cases, parentage has already been determined under the Parentage Act. That's contemplated in K.S.A. 59-501(a) by its "is or has been determined under the Kansas parentage act" language. In a case in which parentage already *has been* determined under the Parentage Act, that determination is controlling in a later probate proceeding under our Supreme Court's ruling in *Reese v. Muret*, 283 Kan. 1, Syl. ¶ 2, 150 P.3d 309 (2007).

That leaves one other option from the Probate Code provision—a child "whose parentage *is . . . determined* under the Kansas parentage act." (Emphasis added.) K.S.A. 59-501(a). And once again, two possibilities emerge. In some cases, it will be possible to bring a Kansas Parentage Act proceeding (essentially a separate lawsuit) while the probate proceeding is pending. That's actually what happened in *Reese*; the Parentage Act claim and probate proceeding started at the same time. Parentage was sorted out in the Parentage Act case, and those findings were then controlling in the probate case. 283 Kan. at 5 ("The probate code treats a determination of parentage pursuant to the Kansas Parentage Act as conclusive.").

But what if there's no way to bring a Parentage Act case? That's the situation we're in here since the person whose parentage is in question, Delwyne, died many years ago. Only a child or a person acting "on behalf of" the child may bring a parentage action.

6

K.S.A. 2017 Supp. 23-2209(a). By "child," we simply mean the person whose parentage is at issue, so a parentage action may be brought on behalf of an adult child. See *Reese*, 283 Kan. at 3, 9-12. But for an adult child who died in 2002, apparently with no outstanding issues about who his heirs were, there's simply no reason for anyone to bring an action "on behalf of" Delwyne to figure out who his father was. So no one today has standing to bring a Parentage Act claim about Delwyne's paternity.

That leaves us with potentially different outcomes depending on whether someone has standing to bring a Parentage Act claim. With no Parentage Act proceeding, Rita argues that we decide whether someone is an heir strictly by biology. Another possibility would be to decide the case under the same standards we'd use if someone had standing to bring the Parentage Act claim.

To settle which approach to take, we've considered the language in the Probate Code—a child "whose parentage *is . . . determined* under the Kansas parentage act." There are at least two ways that phrase might be understood. First, it might mean a child whose parentage is determined *under the standards of* the Kansas Parentage Act. In that case, the standards would be the same whether or not someone had standing to bring a Parentage Act claim. Second, it might mean a child whose parentage is determined *in an action under* the Kansas Parentage Act. In that case, we'd perhaps have different standards depending on whether someone had standing to bring a Parentage Act claim. We can't imagine why the standards should differ.

There is, of course, no problem regarding standing in the probate proceeding; both Rita and Gary have standing to present their respective claims to Chad's estate. And the Probate Code itself references the determination of paternity issues under the Parentage Act. The first two options under the Parentage Act—biology and adoption—make it clear that biology isn't the only consideration. In addition, Kansas Supreme Court caselaw strongly supports fully considering the presumptions of paternity that are part of the

7

Kansas Parentage Act. There are two key cases: *In re Marriage of Ross*, 245 Kan. 591, 783 P.2d 331 (1989), and *Reese*.

In *Ross*, the court considered whether to order genetic testing to determine which of two men was the child's father. One of the men had been married to the mother when the child was born, had acknowledged that he was the father, had been listed on the birth certificate as the father, had been given visitation rights when he and the mother divorced, and had been ordered to pay child support. Even so, the mother filed a paternity action three years after the divorce, claiming that another man was the biological father. The trial court ordered genetic testing, which established that the other man was, indeed, the biological father.

But our Supreme Court said that it had been wrong to order genetic testing before first considering the best interests of the child. The court did this even though the statutory language about testing said that the court "shall order" testing when paternity is disputed. See K.S.A. 38-1118 (Ensley 1986). That "shall order" language remains in statutes today, K.S.A. 2017 Supp. 23-2212(a), while the rule of *Ross* continues to require that we do not literally follow it. Instead, for important policy reasons, judges must consider the best interests of the child before ordering paternity tests.

*Ross* involved a minor child, so the interest in promoting family stability for that child was especially strong. In *Reese*, the court considered whether to extend the *Ross* rule to questions about the paternity of an adult involved in a dispute about whether she was an heir to a probate estate. The woman whose status came into dispute, Heather, had been born to Sam and Deloris Waldschmidt shortly after they married; Sam was listed on the birth certificate. Sam and Deloris got divorced, and Sam remarried before he died. After his death, his widow challenged Heather's right to inherit and sought DNA tests to determine whether Heather was Sam's biological daughter.

Both a probate case and a Parentage Act case proceeded simultaneously, and the district court determined—under the Parentage Act and applying the *Ross* presumption—that genetic testing was not in Heather's best interests. Once again, though, the relevant statute provided that the court "shall order" genetic testing if paternity is disputed. See K.S.A. 2017 Supp. 23-2212(a). But the Kansas Supreme Court affirmed the district court decision and held that the *Ross* rule applied even when the "child" whose parentage was in dispute was an adult:

> "We cannot subvert the presumption of paternity in favor of biology without requiring a court to consider whether it is in the child's best interests regardless of the child's age. Interpretation of the relevant statutes, controlling precedent, and public policy support the district court's decision to hold a *Ross* hearing in Heather's [Parentage Act] action." 283 Kan. at 12.

From *Reese*, we know what standards come into play when the child whose parentage is at issue is still alive and brings a Parentage Act claim to settle the paternity question. The *Ross* rule—considering the child's best interests (even if that child is an adult)—applies. And the determination in the Parentage Act case, under which *Ross* is applied, is binding in the probate proceedings. 283 Kan. at 5.

Our case differs because no one had the ability to bring a Parentage Act claim, but we conclude that the same standards apply under K.S.A. 59-501(a). From that conclusion, we can say that *if* DNA testing is authorized for our case, the district court would still have to consider the presumptions of paternity under the Parentage Act and consider whether the testing was in the best interests of the child (here, Delwyne). We turn next to consider whether DNA testing is authorized in probate proceedings at all.

9

II. *Genetic Testing Can Be Ordered by the District Court in a Probate Case.*

The district court in our case held that it had "no authority . . . to order the requested genetic testing." Rita argues that the court was wrong on this legal point.

Rita says that the general discovery provisions in the Kansas Code of Civil Procedure provide the authority. A provision of the Probate Code, K.S.A. 59-2212, provides that the Kansas Rules of Evidence apply in determining contested probate matters. But no provision in the Kansas Probate Code specifically incorporates the Kansas Rules of Civil Procedure. See *In re Estate of Wolf*, 32 Kan. App. 2d 1247, Syl. ¶ 4, 96 P.3d 1110 (2004), *aff'd* 279 Kan. 718, 112 P.3d 94 (2005).

Even so, the Kansas Supreme Court has provided in Supreme Court Rule 144 that when a factual issue is contested in a probate case, "the discovery procedures" under the Kansas Code of Civil Procedure apply. 2018 Kan. S. Ct. R. 212. Since the Probate Code doesn't have its own provisions for discovery, there's no conflict between this Supreme Court rule and any statutory provision. See *In re Estate of Wolf*, 279 Kan. 718, 724, 112 P.3d 94 (2005) (holding that civil-procedure pleading rules didn't apply in probate proceeding because the Probate Code had its own pleading rules). We therefore apply the discovery rules of the Kansas Rules of Civil Procedure here.

To compare Gary's and Chad's DNA as Rita requested, Gary would have had to provide a DNA sample. That could be obtained with a cheek swab, but even this simple process is a physical intrusion to Gary. That makes it a form of physical examination, something provided for in the civil discovery rules. K.S.A. 2017 Supp. 60-235(a)(1) lets the court order "a party whose . . . physical condition, including blood group, is in controversy to submit to a physical . . . examination by a suitably licensed or certified examiner." The order may be made if a party shows "good cause" to do so. K.S.A. 2017 Supp. 60-235(a)(2).

While this statutory provision, first adopted in 1963, mentions testing for a person's "blood group," it never mentions DNA testing. And we have no Kansas caselaw about whether DNA testing may be ordered under this provision. But our civil-procedure rules are based on the parallel Federal Rules of Civil Procedure, so caselaw from federal courts is especially persuasive when interpreting our rules. See *Douglas Landscape & Design v. Miles*, 51 Kan. App. 2d 779, 783, 355 P.3d 700 (2015). There is federal caselaw that supports Rita's position.

The relevant part of Rule 35 of the Federal Rules of Civil Procedure is the same as our Kansas rule; it lets the court "order a party whose . . . physical condition—including blood group—is in controversy to submit to a physical . . . examination by a suitably licensed or certified examiner." Fed. R. Civ. P. 35(a)(1). Like the Kansas rule, the federal rule requires that the requesting party show "good cause" for the order. Fed. R. Civ. P. 35(a)(2).

Federal courts have used the authority of Rule 35 to order DNA testing in sexual-harassment lawsuits, e.g., *D'Angelo v. Potter*, 224 F.R.D. 300, 302, 304 (D. Mass. 2004); *McGrath v. Nassau Health Care Corp.*, 209 F.R.D. 55, 60, 65 (E.D.N.Y. 2002); *Strong v. Wisc.*, No. 07-C-086-C, 2007 WL 5445863, at *1 (W.D. Wis. 2007) (unpublished opinion); to establish standing to bring a wrongful-death claim, *Turk v. Mangum*, 268 F. Supp. 3d 928, 939 (S.D. Tex. 2017); and to help determine whether the beneficiary of a murdered victim's insurance proceeds may have been involved in the murder, *Kiniun v. Minnesota Life Insurance Company*, No. 3:10CV399/MCR/CJK, 2012 WL 12899102, at *2-3 (N.D. Fla. 2012) (unpublished opinion). The discovery provision found in our statute and Federal Rule 35 explicitly allows for blood tests, one method by which DNA samples could be obtained and a more intrusive method than the cheek swabs often used now.

At least two other states have interpreted similar civil-discovery provisions to allow DNA testing. E.g., *Kaull v. Kaull*, 26 N.E.3d 361, 367 (Ill. App. 2014); *In re Estate of Gaynor*, 13 Misc. 3d 331, 333, 818 N.Y.S.2d 747 (2006). We see no reason to interpret our state's similar provision differently.

Having established that testing may be ordered, when should a court find "good cause" to do so? Federal courts generally require a showing that (1) the DNA evidence is relevant; (2) providing a sample will not unduly infringe on privacy rights; and (3) there is a reasonable possibility of a match or non-match, depending on the party seeking the test. *Kiniun*, 2012 WL 12899102, at *2 (citing cases); *Hudson v. Dr. Michael J. O'Connell's Pain Care Center, Inc.*, No. 11-CV-278-JD, 2012 WL 405483, at *1 (D.N.H. 2012) (unpublished opinion) (considering whether [1] DNA test relevant; [2] the extent of the intrusion into privacy; and [3] the protections to guard the information to avoid privacy concerns); see also *Hawkins-Robertson v. Hessler*, 945 So. 2d 139, 143 (La. App. 2006) (adopting similar factors). The considerations used by these courts seem appropriate. They recognize the significant privacy concerns raised by DNA testing— particularly when used to establish family heritage. In addition, in a case challenging a presumption of paternity, the court must consider the basis for any applicable presumptions and, under *Ross*, the child's best interests.

We recognize, of course, that the *Ross* best-interests test may not have any significant weight here. Delwyne died in 2002, so there may be no "best interests" reason to avoid testing—though we don't know whether reconsidering his lineage would have any potential effect on people who may still be alive. We leave those considerations in the first instance to the district court.

III. *The District Court Abused Its Discretion in This Case Because It Did Not Realize It Had the Discretion to Order Genetic Testing and Thus Didn't Consider the Discretionary Judgment Call It Needed to Make.*

Because the *Ross* test and Parentage Act presumptions apply, whether to order DNA testing—even if legally authorized—is a discretionary decision the trial court must make after considering the presumptions and the child's best interests. We review discretionary decisions only for abuse of discretion. That discretion is abused when the court bases its decision on an error of fact or law or when its decision is highly unreasonable. *State v. Miles*, 300 Kan. 1065, 1066, 337 P.3d 1291 (2014). A court abuses its discretion by failing to exercise that discretion based on a misunderstanding of the law. See *Green*, 54 Kan. App. 2d at 121.

In our case, the district court thought it had no authority to order DNA testing, so it made its decision based on an error of law: The district court never considered the factors we've identified here in deciding whether to order the testing. That's an abuse of discretion.

We express no opinion about whether DNA testing should be ordered. The district court may still conclude—after considering the factors we've noted in our opinion—that testing should not take place. That decision would be supported by several paternity presumptions under the Kansas Parentage Act and would avoid raising questions about Delwyne's family heritage after his death. But that is a discretionary judgment call for the trial court to make, not us.

We vacate the judgment of the district court and send the case back to that court for further proceedings.

13