NOT DESIGNATED FOR PUBLICATION

No. 123,833

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Parentage of R.R.

MEMORANDUM OPINION

Appeal from Barton District Court; STEVEN E. JOHNSON, judge. Opinion filed October 14, 2022. Affirmed.

*Jeffrey N. Lowe*, of Penner Lowe Law Group, LLC, of Wichita, for appellant T.T.

*Tish Morrical*, of Hampton & Royce, L.C., of Salina, for appellee T.R.

Before GARDNER, P.J., MALONE and CLINE, JJ.

PER CURIAM:  Some cases require a district court to have Solomonic wisdom to determine which of two presumptive parents is a child's legal parent. See I Kings 3:16-28. This is such a case. Two men both desire to be the legal father of a child. Both enjoy presumptions of paternity under our law—one because he is the biological father; the other because he was married to the mother when the child was born and, separately, because he signed the birth certificate. Both men showed a full commitment to the responsibilities of fatherhood for the child. The district court recognized the competing presumptions and heard evidence including about the men's families, their extended families, and their relationships with the child. The district court found that the child's legal father was the man who was married to the mother when the child was born and who had signed the birth certificate, although he was not the child's biological father. Biological father appeals. Having extensively reviewed the facts, the law, and the district court's assessment of the best interests of the child, we affirm.

1

*Factual and Procedural Background*

T.R. and Mother married in May 2017 and had a son. In March 2019, another son, R.R., was born during that marriage. T.R. signed his birth certificate as father, apparently having no reason to believe he was not R.R.'s biological father.

T.T., who had had an affair with Mother, took a paternity test when R.R. was around three months old, establishing a 99.9% probability that he was R.R.'s biological father. Mother told T.R. when R.R. was around five months old that she had had an affair with someone.

In November 2019, T.T. filed a paternity action. In March 2020, while the paternity case was pending, T.R. filed for divorce. Mother moved in with T.T. and T.R. moved to intervene in the paternity action, since he had not been named as a party in that suit. The district court granted his motion and then held a trial.

*Trial*

T.T.'s paternity action went to trial in September 2020, when R.R. was 18 months old; T.T., T.R., and Mother were all 26 years old. T.T. testified and called Mother and his mother as witnesses. T.R. testified and presented testimony from his mother, his brother, a friend, and a co-worker. The parties also submitted photos, text messages, receipts, and other exhibits to support their claims.

T.T. and T.R. testified about their employment, homes, families, and relationships with R.R. and Mother. Both owned their own homes, were employed, and had supportive family members who lived nearby. R.R. referred to both T.T. and T.R. as "Da-da" and

2

had positive relationships with them. Mother and T.R. were separated but had not finalized their divorce.

Mother lived with T.T. in T.T.'s home. T.T. lived in a two-bedroom house on his family's farm and worked as a farmer with his father in and around Macksville. His parents lived across the street from him and maintained a positive and loving relationship with R.R. Other family members, including T.T.'s brother, also lived nearby. R.R. had spent time with several of T.T.'s other family members, including T.T.'s grandparents, great-grandmother, aunts, uncles, brother, cousins, and niece.

T.R. lived in a three-bedroom home and worked as a police officer in Great Bend. T.R. had a friend living with him temporarily while that friend looked for a job in the area. T.R.'s parents, maternal grandparents, and an aunt and uncle also lived in Great Bend and had regular interactions with R.R. T.R. normally worked 12-hour shifts, rotating between day shifts and night shifts. T.R.'s mother or R.R.'s babysitter watched R.R. while T.R. was at work.

T.T. focused his arguments on his involvement and requests to be involved in R.R.'s life and the relationship he established with R.R. before filing his petition. T.T. had regular or semi-regular overnight visits with R.R. by August 2019. T.T. watched R.R. every other weekend, but sometimes two weeks would pass before R.R. returned to his care. T.T. at times watched T.T. for entire week-long visits. And after Mother moved in with him, T.T. began spending more time with R.R. So, by trial, T.T. and Mother in effect shared mother's 50% custody of R.R. T.T. testified that had he been given the opportunity, he would have been more involved in R.R.'s life. He argued that his relationship with Mother should be viewed as having a positive effect on R.R.

In response, T.R. provided evidence that he was the only active father that R.R. had had during the first several months of his life. T.R. argued that he acted as R.R.'s

3

primary father and supported R.R. since even before R.R.'s birth. T.R.'s other main focus at trial was on R.R.'s' brother (Brother) and R.R.'s relationship with Brother. Several witnesses testified that R.R. and Brother had a strong bond and special relationship. T.R. claimed that establishing T.T. as R.R.'s legal father would hinder the strength of that relationship. T.R. also argued that R.R. and Brother's relationship could be harmed by changing R.R.'s last name.

Mother testified in support of T.T.'s petition, agreeing that T.T. always wanted and tried to be involved in R.R.'s life, and that he had provided financial and other support for R.R. since learning R.R. is his child. Mother agreed that T.T. had a "father-son relationship" with R.R., "just like any other dad," and that T.T tried to treat Brother like a son as well.

But Mother conceded that she had earlier supported T.R.'s role over T.T.'s as R.R.'s father. For example, in August 2019, Mother sent T.R. a text saying he was a better father to R.R. than T.T. was. She had also opposed T.T.'s decision to seek a name change for R.R. when T.T. contacted her in November 2019. Mother said that she did these things to try to mend her relationship with T.R. and that she now supported T.T.'s desire to change R.R.'s last name.

Some negative facts about each presumed father were also admitted that we would characterize as minor mudslinging, but we need not detail that evidence because the district court did not rely on it. Regardless of the admissions and accusations, the evidence showed that no matter which father R.R ended up with, he would be cared for. In fact, neither T.T. nor T.R. accused the other of being a bad father to R.R. or Brother. And Mother testified that both men were "doing a good job" and were trying their best to "be there" for R.R. The evidence also showed that whichever man lost the paternity case would be devastated. But both men testified that the district court's decision would not change their love for R.R. or their desire to be a part of his life.

4

After taking the matter under advisement for a few days, the district court denied T.T.'s paternity petition and found T.R. the legal father of R.R. The district court recognized the men's competing presumptions of paternity under K.S.A. 2020 Supp. 23-2208(a) and applied the "policy and logic, including the best interests of the child" standard required by K.S.A. 2020 Supp. 23-2208(c). The district court used this court's discussion in *Greer v. Greer*, 50 Kan. App. 2d 180, 193-96, 324 P.3d 310 (2014) *(Greer I)* to guide its analysis.

The district court first applied the factors outlined in *Greer I*, 50 Kan. App. 2d at 195. The court made extensive findings on most of these factors and determined that they mainly favored T.R. The primary facts that the district court relied on in making this decision were T.R.'s longer and more consistent time with R.R. and R.R.'s close relation to Brother. The district court found that T.T. was not involved in the first five months of R.R.'s life and that he did not have as much of a parent-child relationship with R.R. as T.R. had. The district court found that it would be best for R.R. if he had the same "legal parents" as Brother. And although T.T. and Mother were living together, that relationship was new, yet Mother would always share a relationship with T.R. as a coparent to Brother.

T.T. moved to alter or amend the district court's judgment, arguing the district court had given too much deference and weight to T.R.'s presumptions and did not meaningfully consider his biological connection to R.R. T.T. also challenged the district court's application of the *Greer I* factors to the facts here, arguing the district court's factual findings defied logic and lacked support. The district court held a hearing, reconsidered T.T. motion, then denied it.

T.T. appeals. We note that our consideration of the appeal was delayed because of briefing errors on both sides. We also note that Mother, although named as a party, waived her right to file a brief and has adopted the arguments in T.T.'s brief.

5

I.  *Did the District Court Err in Finding T.R. to be R.R.'s Legal Father Even Though He was Not R.R.'s Biological Father?*

T.T. first argues that the district court improperly weighed the parties' conflicting presumptions of paternity based on its misconstruction or misapplication of the Kansas Parentage Act (KPA). K.S.A. 2020 Supp. 23-2201 et seq. This issue requires statutory interpretation, so it presents a question of law that we review de novo. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019).

*Basic Legal Principles*

The purpose of the Kansas Parentage Act (KPA) is to provide for the "equal, beneficial treatment of children." *In re Marriage of Ross*, 245 Kan. 591, 597, 783 P.2d 331 (1989). The Kansas Parentage Act requires courts to act in the child's best interests "when imposing legal obligations or conferring legal rights" on the parent/child relationship. 245 Kan. at 597. The Kansas Parentage Act recognizes that "every child has an interest not only in obtaining support, but also in inheritance rights, family bonds, and accurate identification of his parentage." 245 Kan. at 597.

K.S.A. 2020 Supp. 23-2208(a) establishes six presumptions of paternity. If, as here, two presumptions conflict, the court must determine which presumption is founded on "weightier considerations of policy and logic, including the best interests of the child" before deciding which presumption controls. K.S.A. 2020 Supp. 23-2208(c).

The competing presumptions relevant here arise under K.S.A. 2020 Supp. 23-2208(a):

6

"A man is presumed to be the father of a child if:

"(1) The man and the child's mother are, or have been, married to each other and the child is born during the marriage or within 300 days after the marriage is terminated by death or by the filing of a journal entry of a decree of annulment or divorce[; or]

(4) The man notoriously or in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgment made in accordance with K.S.A. 2020 Supp. 23-2223 or K.S.A. 65-2409a, and amendments thereto[; or]

(5) Genetic test results indicate a probability of 97% or greater that the man is the father of the child." K.S.A. 2020 Supp. 23-2208(a).

Before trial, it was undisputed that T.R. was entitled to two presumptions of paternity: one because he was married to Mother when R.R. was born, see K.S.A. 2020 Supp. 23-2208(a)(1), and another because he had recognized paternity in writing by signing R.R.'s birth certificate, see K.S.A. 2020 Supp. 23-2208(a)(4). The parties also agree that T.T. was entitled to a presumption of paternity under K.S.A. 2020 Supp. 23-2208(a)(5), based on the genetic test results showing a 99.99% probability that R.R. is his biological child.

K.S.A. 2020 Supp. 23-2208(b) provides that "[a] presumption under this section may be rebutted only by clear and convincing evidence, by a court decree establishing paternity of the child by another man or as provided in subsection (c)." Nothing at trial refuted the factual bases for any of the three presumptions—nothing showed, for example, that T.R. was not validly married to Mother when R.R. was born, or that T.R.'s signature on the birth certificate was not valid, or that the genetic test results erroneously showed T.T. to be the biological father of R.R. So, no clear and convincing evidence rebutted any of the three presumptions. Nor did any one show that a court decree had established paternity of the child by another man. See K.S.A. 2020 Supp. 23-2208(b). Thus the district court properly found that subsection (c) applied.

7

A. *We Find No Error of Law in the District Court's Decision*

T.T. asserts that the district court deviated in several ways from the legal analysis required by K.S.A. 2020 Supp. 23-2208(c) ("the presumption which on the facts is founded on the weightier considerations of policy and logic, including the best interests of the child, shall control").

1. *Bias against biological father*

Throughout his brief, T.T. asserts that the district court improperly placed its thumb on the scales in T.R.'s favor when addressing the facts, policy, and logic considerations that the KPA requires, showing the district court's bias against him and imposing on him a higher burden of proof than the KPA requires.

T.T. shows that some of the district court's language disfavored him. Early in its memorandum opinion, the district court recognized that T.R. and T.T. were both presumptive fathers of R.R. under K.S.A. 2020 Supp. 23-2208(a)(1), (4), and (5), who sought recognition as R.R.'s "legal father." Yet the district court noted that T.R. was already R.R.'s "legal father":

> "Something of note, it is the Court's belief that [T.R.] is currently the legal father of the child. He was married to the mother at the time of birth and he has acknowledged his paternity in the application of the birth certificate. If [T.T] had not come forward in an attempt undo the voluntary acknowledgment of paternity and the presumption of paternity pursuant to marriage, this relationship will have not changed and it can only be changed by the court's decision in this matter."

T.T. also claims that the district court dismissed his assertion that he would have been just as involved in the child's life as T.R. was, had he been given the same opportunity as T.R., by saying T.T. was an "interloper on the existing parent child

8

relationship of [T.R.]." This and other language in the district court's decision lends some support to T.T.'s claim that the district court initially viewed T.R.'s presumptions as weightier.

But underlying the district court's language is its recognition that T.R.'s presumption of legitimacy was first in time, arising on the date the child was born, while T.T.'s biological presumption arose only later when he filed the genetic test results with the district court. See *In re Adoption of I.H.H.-L.*, 45 Kan. App. 2d 684, 697, 251 P.3d 651 (2011); *Greer I*, 50 Kan. App. 2d at 189.

Our appellate courts have repeatedly applied the *Ross* and *Ferguson* analysis which focuses on the legal presumption of paternity that existed before the start of the paternity action. *Reese v. Muret*, 283 Kan. 1, 8-9, 150 P.3d 309 (2007) (citing *Ross*, 245 Kan. at 596; *Ferguson v. Winston*, 27 Kan. App. 2d 34, 36, 996 P.2d 841 [2000]). The *Ross* court held that when there is a presumed father to a child born into a marriage, the district court should consider the best interests of the child before ordering a genetic test that may reveal someone else is the child's biological father. 245 Kan. at 601-02. Similarly, the *Ferguson* court held that genetic testing is not conclusive on the issue of paternity and ordered the district court to consider all of the evidence available before deciding a child's paternity if it determined that genetic testing was in the child's best interests. 27 Kan. App. 2d at 38.

The district court here did no more. And the district court's statement that had no one challenged T.R.'s fatherhood, T.R.'s relationship with R.R. would not have changed is logical and true. Our society commonly recognizes a man who is married to the mother at the time of the birth as the child's father. The presumption of legitimacy in K.S.A. 2020 Supp. 23-2208(a)(1) reflects as much. Thus children born to intact marriages are presumed to have legal fathers without the need for any adjudication of the fact of fatherhood. T.R. had the benefit of that legal status.

Still, the district court explained that regardless of T.R.'s "legal status," it was required to apply the analysis outlined in *Greer I*:

> "It is the duty of this Court to take the factors set out in *Farbo vs. Greer* and any other factor relevant to the best interest of the child to determine if the Court should undo the current legal status of father in regards to [T.R.]. This Court will discuss this more fully below, but the Court is of the opinion that no evidence presented at the hearing would compel the Court to believe that it is in the best interest of the child to undo the current legal status of [T.R.] as the child's father despite the biology of the child."

Other than the best interest of the child, the statute does not define what "policy" or "logic" considerations are required. Kansas caselaw is sparse on this issue. Yet, as the district court recognized, our best guidance is found in *Greer I*, 50 Kan. App. 2d at 193-95. The district court properly followed *Greer I*'s analysis and applied each of its factors. Although T.T. objects to some of the district court's wording, its legal analysis is sound.

### 2. *Too much weight to presumption of legitimacy*

Second, T.T. alleges error in the district court's legal finding that a presumption of legitimacy is generally recognized as one of the strongest presumptions of paternity. He asserts that this presumption should weigh the same as every other statutory presumption of paternity.

But the district court's assessment of the law is correct—under Kansas law "the ancient presumption of the legitimacy of a child born in wedlock is one of the strongest presumptions known to the law." *Greer I*, 50 Kan. App. 2d at 193 (quoting *Ross*, 245 Kan. at 596). See also *Ferguson*, 27 Kan. App. 2d at 35-36 (focusing on the legal presumption of paternity that existed before the biological father filed a paternity action). Kansas does not stand alone in that holding. Rather, in family law, "[t]here is a strong presumption that a woman's husband is the father of any child born during the marriage."

10

*Greer I*, 50 Kan. App. 2d at 185-86 (quoting 6 Rutkin, Family Law and Practice § 63.02[5] [2013]; also citing 1 Elrod and Buchele, Kansas Family Law § 7.12 [1999]). The presumption is so strong that it "'can defeat the claim of a man proven beyond all doubt to be the biological father.'" *Nevitt v. Bonomo*, 53 So. 3d 1078, 1081 (Fla. Dist. Ct. App. 2010).

T.T. argues that the sole reason for weighing this presumption more heavily than other presumptions of paternity is to avoid bastardizing a child born during a marriage. He then claims that this reason is outdated because (1) many children today are born to unmarried parents; and (2) we can now resolve doubts about paternity with a high degree of scientific certainty by DNA testing.

But even if we assume, without deciding, that the anti-bastardization rationale supporting the presumption of paternity is outdated, and if we also assume that this is the sole rationale driving the strength of this presumption, we have no Kansas law supporting T.T.'s assertion that the strength of this presumption of paternity is lessened when its rationale no longer applies. Cf. *Fish v. Behers*, 559 Pa. 523, 528, 741 A.2d 721 (1999) (finding that policy underlying this same presumption of paternity is preservation of marriages, and that presumption applies only when that underlying policy would be advanced by application of presumption.) To the contrary, the plain language of our statute contradicts any conditionality of this presumption, stating, "[a] man *is presumed to be the father* of a child if . . . [t]he man and the child's mother are, or have been, married to each other and the child is born during the marriage[.]" (Emphasis added.) K.S.A. 2020 Supp. 23-2208(a)(1). Nor is that language permissive—it does not state that a man *may be presumed to be the father* if that event occurs. As a result, under this law, T.R. enjoyed a presumption of paternity because R.R. was born during T.R.'s marriage to Mother.

11

More fundamentally, it is not the position of this court to determine that a legal presumption is outdated, as T.T. invites us to do. That kind of policy determination is beyond our scope of review. It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Instead, our duty is to follow precedent. See *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017) (finding appellate courts duty-bound to follow precedent absent indication Kansas Supreme Court intends to depart from previous position). And our precedent states that "the ancient presumption of the legitimacy of a child born in wedlock is one of the strongest presumptions known to the law." *Ross*, 245 Kan. at 596.

But even if the district court should have given equal but not greater weight to the presumption of legitimacy as a matter of "policy and logic," we find no reversible error. The district court hesitated to recognize the presumption of legitimacy as stronger, did not base its ruling on that presumption, and carefully explained that it would have ruled the same way even without that presumption:

> "The last consideration that the Court is going to address, and would like to make clear that whether or not it is a valid consideration, the Court would make the decision of legal paternity to [T.R.] without it. The *Farbo vs. Greer* Court discusses the fact that several courts, including those in Kansas have applied a presumption of legitimacy of a child born in wedlock as being one of the strongest presumptions known to the law. In reviewing the case, the Court is not certain as to the Court of Appeals positions regarding the legitimacy of this presumption at this time. In reading *Farbo vs. Greer*, the Court believes that it still exists despite the clear right of biological father to attack the presumption in consideration of the child's best interest. The Court just wishes to note that this presumption, if it is still accepted as the common law of our State, does weigh in favor of [T.R.] and the Court adopts that presumption as not being overcome by any of the evidence presented by [T.T.] in regards to the best interest of the child. Again, the Court wants to emphasize that it would have made the same decision regardless of the application of this presumption based upon the best interest of the child and the factors set out above."

12

So even if the presumption of legitimacy should weigh the same as the other presumptions of paternity, T.T. cannot show that the court's decision would have been any different had it given equal weight to that presumption. Rather, the court would have made the same decision based on its assessment of R.R.'s best interests, even without that presumption.

### 3. *Too much weight to the birth certificate as a VAP*

Third, T.T. contends that the district court erroneously treated T.R.'s signed birth certificate as a VAP, giving it too much weight. T.T. contends that the district court relied on the voluntary acknowledgement of paternity standard in K.S.A. 2020 Supp. 23-2204(b)(1) (providing that a valid acknowledgement of paternity [VAP] "creates a permanent father and child relationship which can only be ended by court order") rather than on the proper standard in K.S.A. 2020 Supp. 23-2208(a)(4) (creating a rebuttable presumption of paternity when "the man . . . in writing recognizes paternity of the child, including but not limited to a voluntary acknowledgment made in accordance with K.S.A. 2020 Supp. 23-2223 or K.S.A. 65-2409a, and amendments thereto").

True, the district court called the signed birth certificate a "voluntary acknowledgement of paternity" more than once. But one's signature as father on a birth certificate is, speaking generically, a voluntary way to acknowledge paternity. Nothing in the district court's decision convinces us that it thought T.R.'s signed birth certificate was a VAP under K.S.A. 2020 Supp. 23-2204(b)(1). The district court did not find, for example, that T.R. made his written acknowledgement of paternity in accordance with K.S.A. 2020 Supp. 23-2223 or K.S.A. 65-2409a, which relate to VAPs. Still, the district court did rely on a VAP case, *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 392 P.3d 68 (2017) and failed to distinguish a VAP from a birth certificate.

13

But even if the district court erroneously treated the birth certificate as a VAP, this was harmless error—the district court still found that it had to weigh the competing presumptions and that T.T., as a biological father, could attack the VAP:

> "However, the Court still finds that it still must weigh the competing presumptions in this instance as set out in *Farbo v. Greer*. . . . Under this case it is clear that even though the mother and presumptive father as a result of marriage and VAP could not revoke the voluntary acknowledgement of paternity, this acknowledgment of paternity can still be attacked by a biological father since he is not a party to the acknowledgement."

Our reading of the court's full decision shows that it considered the appropriate legal factors and did not merely rely on the fact that T.R. had signed the child's birth certificate or a VAP.

### 4. *Too little weight to biology*

Fourth, T.T. argues that the district court gave insignificant weight to his presumption of paternity from his genetic test results. See K.S.A. 2020 Supp. 23-2208(a)(5). He points to the district court's statement that biology was the "most insignificant factor" in a parent-child relationship.

When read in context, the district court's comment reflected its personal experience and made the point that a parent-child relationship may be established through commitment, without a biological connection:

> "The Court also fully understands that all of the above-mentioned parties will be heartbroken if the child is removed from their bond that they have. All of the parties emphasized, including the extended family, that they would not change any of their connections with the child despite the ultimate ruling of the Court. Certainly, the Court believes that the assertions of [T.R.] and his family that the biology of the child does not

14

matter to them is true. It has been this Court's experience, personal and observed, after being involved in many adoptions and other cases similar to this, that the biology is probably the most insignificant factor regarding a relationship of a parent and child that there is. It is the commitment that truly counts."

By this language, the district court neither defeated T.T.'s presumption of paternity nor dismissed it as insignificant.

Rather, the district court correctly recognized that under Kansas law, a presumption of paternity from genetic test results is not controlling and does not alone defeat a competing presumption of paternity. Although several states have enacted statutes providing that DNA is conclusive on the issue of paternity, Kansas has not. Elrod, Child Custody Practice and Procedure § 1:3 Presumption of legitimacy—Biological father's rights (2022). As our Supreme Court has recently stated: "Shifting parenthood based on actual biology alone could be detrimental to the emotional and physical wellbeing of any child." *In the Matter of the Parentage of M.F.*, 312 Kan. 322, 340, 475 P.3d 642 (2020). Thus, "biology is not necessarily destiny under the KPA." 312 Kan. at 340.

Rather, "*Ross* and *Ferguson* support the protection of presumptive paternity over biological paternity when it is in the child's best interests." *Reese*, 283 Kan. at 9. "The *Ferguson* court . . . specifically held that genetic testing is not conclusive on the issue of paternity. *Ferguson*, 27 Kan. App. 2d at 38." 283 Kan. at 10. The public policy in Kansas is that "paternity is both broader and deeper than genetics." 283 Kan. at 10. Thus "a biological relationship does not guarantee the permanency of the parental rights of an unwed natural father." *In re Adoption of A.A.T.*, 287 Kan. 590, Syl. ¶ 3, 196 P.3d 1180 (2008).

As *Reese* found:

"The presumptions of paternity set forth in K.S.A. 38-1114(a) [now K.S.A. 2020 Supp. 23-2208(a)] were instituted to protect and maintain the concept of family identity. Intruding upon this concept can cause emotional damage to children of all ages, not only to minors. See *Ross*, 245 Kan. at 602 (noting that '[t]he shifting of paternity from the presumed father to the biological father could easily be detrimental to the emotional and physical well-being of *any* child' [emphasis added])." 283 Kan. at 10-11.

In short, our review of the district court's memorandum opinion shows that T.T.'s assertion of bias in favor of T.R. is not completely unfounded. But that "bias" was born of the district court's correct reading of the law and not of any personal animus against T.T. The district court neither misconstrued nor misapplied the law in determining paternity. Instead, the district court completed a full and fair analysis, recognized two competing presumptions in T.R.'s favor and one in T.T.'s, and then weighed them in the exercise of its discretion. It applied the policy as expressed by the Legislature in the statutory presumptions, and its outcome is consistent with logic, primarily because it would promote the child's best interests. Its legal analysis met the requirements of K.S.A. 2020 Supp. 23-2208(c), so reversal for an error of law is unwarranted.

### B. *We Find No Error of Fact in the District Court's Decision*

T.T. also alleges that several of the district court's factual findings under *Greer* are unsupported by the record. When, as here, the district court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are enough to support the district court's conclusions of law. *Graham v. State*, 263 Kan. 742, 753, 952 P.2d 1266 (1998). We are to accept as true the evidence and all inferences to be drawn from the evidence which support or tend to support the trial judge's findings. 263 Kan. at 753-54.

We italicize below the factors relevant to the best interests of the child in paternity cases as stated in *Greer I*, 50 Kan. App. 2d at 195 (citing 1 Elrod and Buchele, Kansas Family Law § 7.15 [1999]), and we summarize the district court's findings on each of them:

1. *Who R.R. considers his father and the relationship they share.* Because he was only 18 months old, R.R. probably had a limited understanding of "father." R.R. called both T.T. and T.R. "'Da-da'" and had a relationship with both, but R.R.'s relationship with T.R. was comparably stronger.

2. *Nature of R.R.'s relationship with presumed father and presumed father's intent to continue it.* This factor favored T.R., as "the natural relationship . . . of father/child lies with [T.R.]."

3. *Nature of R.R.'s relationship with presumed father and presumed father's desire to establish a relationship and provide for R.R.'s needs.* Both T.R. and T.T. wished to continue their relationships with R.R. and provide for his needs. But T.R. was the presumed father who had "actually been doing [that] through the child's entire life."

4. *Possible emotional impact of establishing biological paternity.* It was not in R.R.'s best interest to "tak[e] away the relationship of father from [T.R.] and giv[e] it to [T.T.]."

5. *Whether a negative result would leave R.R. without a legal father.* This factor did not apply.

6. *Nature of Mother's relationships with presumed fathers.* Mother's support for each of the presumed fathers changed when she separated from T.R. Mother and T.T. were currently in a relationship and living together. But because Mother would continue to have a relationship with T.R. as a coparent, this factor favored T.R.

7. *Motives of the party raising the paternity action.* T.T. petitioned with no "sinister motives." (The court seemingly assigned no weight to this factor.)

17

8. *Harm or medical need in identifying biological father.* T.T. had already been identified as the biological father. (The court said this factor carried very little weight in its determination.)

9. *Relationship between R.R. and any siblings.* This factor favored T.R.

10. *Whether there have been previous opportunities to raise the issue of paternity.* T.T. timely filed his petition. (The court seemingly weighed this factor as neutral.)

*Greer I* also noted additional factors that courts may consider in determining the best interests of a child in a paternity case: time, notoriety of the child's situation in the community, stability of the home the child will be raised in, the child's uncertainty over the paternity issue, and other factors that will maximize the child's opportunity for a successful life. 50 Kan. App. 2d at 195-96. But T.T. does not contend that the district court should have considered additional factors here.

T.T. confines his analysis to the 10 factors listed above. He concedes that the district court properly weighed factor 9 in T.R.'s favor, that the district court properly found factor 5 did not apply, and that the district court properly found factor 10 did not affect its analysis. T.T. also argues that factors 1, 2, 3, 6, and 7 should have been considered neutral rather than favor T.R. We assume, without deciding, that T.T. is correct as to all these factors. Thus, none of these factors favor T.T. but factor 9 (the relationship between R.R. and his Brother) favors T.R.

This leaves only factors 4 and 8. T.T. contends the district court should have weighed in his favor these two related factors: the possible emotional impact of establishing biological paternity, and the harm or medical need in identifying biological father. We examine the district court's factual findings on these two factors for substantial competent evidence. The district court found that it was not in R.R.'s best interest to remove the relationship of father from T.R. and give it to T.T., that T.T. had already been

18

identified as the biological father, and that the "harm or medical need" factor carried "very little weight" in its decision.

To support his claim that these findings lack support, T.T. cites research suggesting that identifying a child's biological father could emotionally benefit a child. T.T. argues that failing to identify him as R.R.'s biological father could harm R.R. because they already have a relationship and cutting it off "could lead to feelings of abandonment, confusion, and issues with identity formation." But T.T. did not present this information at trial for the district court's review, so it is not part of our record on appeal. These factual assertions without an evidentiary basis are unsupported. And we are a court of review, not a fact-finding court. *State v. Hutto*, 313 Kan. 741, 746-47, 490 P.3d 43 (2021).

Even more to the point, factors 4 and 8 assume that the biological father has not yet been identified, unlike here. Factor 4 is the "possible emotional impact of *establishing* biological paternity," and factor 8 similarly assesses the "harm . . . or medical need in *identifying* the biological father." (Emphasis added.) *Greer I*, 50 Kan. App. 2d at 195. But the district court correctly found that T.T. had been "identified" or "established" as the biological father by genetic testing before he filed the paternity action. R.R. already called T.T. "Da-da," and T.T. said he would not change his connection with the child despite the ultimate ruling of the court. No evidence showed that failing to find in T.T.'s favor could make R.R. feel abandoned or confused about his identity. These facts provide substantial, competent evidence supporting the district court's findings about factors 4 and 8.

Factors 4 and 8 may help determine a child's best interests when no genetic test resulting in a presumption of paternity has been done *before* a paternity action is filed or when a genetic test was done before the paternity action was filed but its result is inadmissible because a party made a proper statutory objection. See *Greer I*, 50 Kan.

19

App. 2d at 190-91 (limiting a *Ross* hearing to these two situations, as the purpose of a *Ross* hearing is to determine whether performing a genetic test is in best interests of the minor child). Yet neither of those situations occurred here.

### C. *The District Court's Decision Was Not Arbitrary, Fanciful, or Unreasonable*

T.T. generally asserts that the district court abused its discretion in weighing the relevant factors, as the only reasonable decision would have been to grant his petition. But to the extent that T.T. invites us to reweigh the evidence, we decline. The trial judge is in the best position to evaluate the testimony of the witnesses, and this court will not reweigh the evidence, substitute its judgment for that of the trial court's, or pass upon the credibility of the witnesses. *State, ex rel. Secretary, DCF v. M.R.B.*, 313 Kan. 855, 863-64, 491 P.3d 652 (2021).

"'"The trial court is in the best position to make the inquiry and determination [regarding the welfare and best interests of the child], and in the absence of abuse of sound judicial discretion, its judgment will not be disturbed on appeal."' [Citation omitted.]" *Smith*, 306 Kan. at 60. A district court abuses its discretion when its decision

> "'(1) is arbitrary, fanciful, or unreasonable, i.e., if no reasonable person would have taken
> the view adopted by the trial court; (2) is based on an error of law, i.e., if the discretion is
> guided by an erroneous legal conclusion; or (3) is based on an error of fact, i.e., if
> substantial competent evidence does not support a factual finding on which a prerequisite
> conclusion of law or the exercise of discretion is based.' *State v. Ward*, 292 Kan. 541,
> 550, 256 P.3d 801 (2011), *cert. denied* 565 U.S. 1221, 132 S. Ct. 1594, 182 L. Ed. 2d 205
> (2012)." 306 Kan. at 60.

Few Kansas cases have asked us to review a district court's weighing of the competing presumptions of paternity for unreasonableness. The most comparable is *Greer I* after remand—*Greer v. Greer*, No. 112,764, 2015 WL 6835286, at *4 (Kan. App.

2015) *(Greer II)*. That case weighed the presumption of legitimacy against the biological father presumption.

In *Greer II*, a married mother dated another man when separated from her husband, with whom she already had a child. After mother and husband reconciled, mother gave birth to biological father's child. Mother and biological father completed genetic testing which confirmed his biological paternity before he filed a paternity suit. Biological father had around 22 interactions with the child over 8 months. After applying K.S.A. 2020 Supp. 23-2208(c) and weighing the competing presumptions as directed in this court's remand order in *Greer I*, the district court found for Mother's husband and against biological father. Biological father appealed, yet finding no abuse of discretion in the district court's decision, the *Greer II* panel affirmed. 2015 WL 6835286, at *1-4. Although each case depends on its own facts, *Greer II* shows, at the very least, that the biological father's presumption does not necessarily outweigh the marital father's presumption of legitimacy.

Here, as in *Greer II*, 2015 WL 6835286, at *4, "the district court faced an inherently difficult judgment call." The varied interests can be properly balanced only by a careful and conscientious fact-finder familiar with the particularities of a given case. See *S.D. v. A.G.*, 764 So.2d 807, 809 (Fla. Dist. Ct. App. 2000) (observing that cases involving children conceived between a married woman and a man who is not her husband are intensely fact-sensitive and "difficult, if not impossible, to address within the case law method"). After considering the relevant statutory presumptions of paternity and the best interests of the child, the district court decided in T.R.'s favor. We cannot find that either factor 4 or 8 should have been weighed in T.T.'s favor.

But even if we agreed that both factors favored T.T., we could not also determine whether those factors outweighed factor 9 (about Brother and T.R.'s relationship with Brother), which factor T.T. admits properly favors T.R. Such reweighing is beyond the

21

scope of our review. We cannot second guess the district court's concern with the child's stability. See *In re Parentage of M.F.*, 312 Kan. at 352 (requiring a former same sex partner to have acknowledged maternity notoriously or in writing by time of baby's arrival because that timing "incentivizes stability for that child over surmountable relationship disappointments that are bound to occur."); *Ross*, 245 Kan. at 602 (finding that "[w]hen a marital relationship has been terminated, children of the marriage need for the court to provide stability in their lives, to acknowledge that their perception of time is different from that of an adult, and to take into consideration their past relationship with their parents").

Determining what is in a child's best interests is inherently a judgment call. Having reviewed the facts of record in light of the governing law, we cannot say that no reasonable person would have ruled as the district court did. We thus find no abuse of discretion in the district court's thoughtful and thorough opinion.

II.    *Did the District Court Violate T.T. or R.R.'s Constitutional Rights?*

Finally, T.T. raises a constitutional challenge, arguing the district court's decision violated his constitutional due process right to parent R.R. T.T. also claims that the dismissal violated R.R.'s own constitutional due process right to have a relationship with his biological father.

But T.T. did not raise these arguments in the district court, so they are unpreserved. Constitutional grounds for reversal asserted for the first time on appeal are not properly before an appellate court for review. *Bussman v. Safeco Ins. Co. of America*, 298 Kan. 700, 729, 317 P.3d 70 (2014). Although several exceptions exist to that general rule, T.T.'s brief does not invoke any of those exceptions and explain why we should consider his constitutional claims for the first time on appeal. He thus disregards Supreme Court Rule 6.02(a)(5) (2022 Kan. S. Ct. R. at 36). See *State v. Johnson*, 309 Kan. 992,

995, 441 P.3d 1036 (2019). And even if he had complied with this rule, "[t]he decision to review an unpreserved claim under an exception is a prudential one," so this court does not need to do so. *State v. Gray*, 311 Kan. 164, 170, 459 P.3d 165 (2020). Because we are a court of review, not a fact-finding court, we would and do decline to address the merits of the unpreserved constitutional claims.

III.     *Did the District Court Err by Not Holding a* Ross *Hearing to Determine the Admissibility of the Genetic Testing?*

T.R. claims, for the first time on appeal, that the court erred by not holding a pretrial hearing under *Ross*, to determine the admissibility of T.T.'s genetic testing. T.R. relies on K.S.A. 2020 Supp. 23-2212(b) and asserts that because he did not agree to the testing, the district court had to hold a *Ross* hearing to determine whether testing was in R.R.'s best interests. T.R. then posits that had the district court conducted this hearing, the court would have precluded T.T. from submitting the genetic evidence necessary to establish his presumption of paternity under K.S.A. 2020 Supp. 23-2208(a)(5).

But T.R. did not raise this argument in the district court, so it is unpreserved. See *Gannon v. State*, 303 Kan. 682, 733, 368 P.3d 1024 (2016). Nor did T.R. file a cross-appeal to allow appellate review of this claim. See K.S.A. 2020 Supp. 60-2103(h) (requiring an appellee who wants this court to review a decision "of which such appellee complains" to file a cross-appeal); *Lumry v. State*, 305 Kan. 545, 553-54, 385 P.3d 479 (2016) (finding district court's ruling could not be disturbed when appellee failed to cross-appeal). Thus we dismiss this argument.

Affirmed.